Filed 8/15/23  In re A.F. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re A.F.,<br><br>a Person Coming Under the Juvenile Court Law. | B322139<br><br>(Los Angeles County Super. Ct. No. 22CCJP00215) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>ANTHONY F.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Tamara Hall, Judge.  Affirmed.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

_____

Appellant Anthony F. (Father) challenges the juvenile court's assertion of jurisdiction over his child, A.F., under Welfare and Institutions Code[1] section 300, and its order removing A.F. from his custody under section 361. The primary basis for both the jurisdiction finding and removal order was a series of incidents where Father perpetrated domestic violence against A.F.'s mother, Alicia F. (Mother).[2] We find that substantial evidence supports the juvenile court's assertion of jurisdiction under one of the two grounds relied upon by the juvenile court, and thus affirm that order. We further conclude that the juvenile court's order removing A.F. from Father's custody was supported by substantial evidence.

### FACTUAL AND PROCEDURAL BACKGROUND

Before marrying Father, Mother was married to Lawrence C.; they married in 2005, had a daughter named Lauren C. in 2007, and divorced in 2016 or 2017. Father and Mother married in 2018, and their daughter A.F. was born in September 2019. As Lawrence was incarcerated from the time of Lauren's birth through September 2021, Lauren lived with Mother, Father, and A.F.

_____

[1] Subsequent unspecified statutory references are to the Welfare and Institutions Code.

[2] Mother is not a party to this appeal.

On December 24, 2020, Mother filed for divorce from Father. In the family court proceedings, Mother requested full physical custody of A.F. and joint legal custody with Father. Mother had not finalized the divorce by the time the juvenile court issued the jurisdiction and disposition orders which are the subject of this appeal.

## A. DCFS Investigation

On December 10, 2021, respondent Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging Father emotionally and physically abused A.F. The reporting party stated that on August 26, 2021, Father got upset with Mother because A.F. was making a mess, and threw a vase at Mother. The vase broke and cut Mother's thigh, requiring 19 stitches. The reporting party indicated there had been two other incidents of domestic violence between Father and Mother.

On December 14, 2021, a social worker spoke with the manager of the apartment building where A.F. reportedly lived. The building manager believed that both Mother and Father lived there with two children, a two-year-old and a 14-year-old. She indicated that Father smoked marijuana in the home, and the neighbors complained that Mother and Father fight.

On December 16, 2021, the social worker went to the family home and interviewed Mother and Lauren separately. Mother indicated that Father did not live at the apartment but came to see A.F., and A.F. was with Father at the time of the interview. The social worker asked for Father's address, but Mother said she did not know where he was staying. Mother denied any domestic violence and stated that the August 2021 incident involving the vase was an isolated event. Regarding that

3

incident, Mother indicated that she and Father argued after she told him that she was going to finalize the divorce because he had been cheating on her. Father got upset, said "whatever," and swung his arm. Father's arm accidently hit the vase, which was on the dining table. Mother explained that Father is very tall[3] and very strong, so the vase broke and she was cut on her left thigh, requiring her to get stitches. Mother stated that the children were upstairs in their room and did not witness the incident. Mother went to the police station the day after the incident and filed a complaint against Father. When the social worker told Mother DCFS had been informed about two other domestic violence incidents between Mother and Father, Mother denied any such other incidents.

Lauren told the social worker that she had had thoughts of harming herself a few weeks earlier; she indicated she was under a lot of pressure at school and, after talking with her counselor and Mother, she was doing much better. Lauren denied being abused, and stated that while Mother and Father argued sometimes, the arguments never turned physical. Lauren denied seeing or hearing the August 2021 incident where Mother was cut by the vase. Lauren indicated that Father lived at the home.

The social worker returned to the family home on a different day and met with A.F., Mother, and Father. The social worker did not observe any marks or bruises on A.F.'s body and observed that A.F. wanted to be held by Father. When interviewed privately, Father denied any domestic violence with Mother. Father stated that he and Mother were in the middle of

---

[3] Mother reported that Father is six feet, eight inches tall; police reports list his height as six feet, four or five inches.

a divorce; the plan was for Mother to get full physical custody of A.F. and for Mother and Father to share legal custody. Father indicated that he had moved out of the home about six months earlier and was staying with a friend; he declined to divulge the friend's name or address. Describing the August 2021 incident, Father said he and Mother started talking about the divorce. As he was speaking, he was using his hands a lot and he accidentally hit a vase on the table where Mother and Father were sitting, causing it to break and fall on Mother. As Mother was picking up the pieces, she cut her leg. Father took Mother to the hospital, where she received stitches. According to Father, the children were upstairs at the time and did not see the incident.

DCFS obtained the Los Angeles Police Department (LAPD) report regarding the August 26, 2021 incident. Mother went to the police station on August 28, 2021 to file a report; Mother told officers that she feared Father and had gone to the police station as soon as she felt safe doing so. Mother told officers that the incident began when Father became upset because A.F. had made a mess, and Mother and Father began to argue. During the argument, a glass vase came flying at Mother and, when she raised her left arm to protect herself, the vase shattered and caused a small cut on her arm and a larger laceration on her thigh. Mother told the officers she was unsure whether Father had picked up and thrown the vase, or whether he had swept his arm across the table and struck the vase, propelling it towards Mother. Father immediately became remorseful and stated that it was an accident. He took Mother to the hospital, where she received 19 sutures. Mother indicated that, because she was in fear of Father, she did not tell hospital staff what had actually

5

happened, and instead stated she had dropped the vase accidentally. The officers helped Mother obtain an emergency protective order, which had a September 4, 2021 expiration date. Mother told the officers that she had previously reported another incident of domestic violence on May 10, 2020 involving Father,[4] and that there were three or four other incidents of domestic violence involving Father which she had not reported.

On December 29, 2021, the social worker interviewed Lauren's father, Lawrence. Lawrence stated that he had been seeing Lauren every other weekend and he took her out during visits, but she did not stay overnight with him. Lawrence said Mother informed him that Lauren had made an attempt to cut herself, but when he asked Lauren about it, she did not provide any details. Lawrence stated that Lauren told him that Mother and Father argued a lot and Father would throw things around. Lauren further told Lawrence she had taken videos of Mother and Father arguing and screaming, but she did not show the videos to him. Lawrence believed that Father was living with Mother.

On December 30, 2021, DCFS obtained LAPD logs of calls for service Mother had made to police on May 10, 2020 and January 23, 2021. The entry for the May 10, 2020 incident indicated Mother had made a 911 call claiming Father assaulted her. The log regarding the January 23, 2021 call did not have any apparent references to Father, and stated an unknown male

---

[4] The date of this incident was not stated in the report, although the report did include the number of the prior report. DCFS later obtained an arrest report bearing this number, which related to an incident that occurred on May 10, 2020.

was blocking a residential driveway, refusing to move, and possibly under the influence.

On January 3, 2022, the social worker asked Father about the May 10, 2020 incident.[5] Father stated he and Mother had gotten into an argument, but there had been no physical altercation. The social worker also asked Father to drug test; Father later tested and the results came back negative as to all substances.

On January 11, 2022, Lawrence contacted the social worker to ask about the status of DCFS's investigation. Lawrence stated that Lauren had sent him audio recordings of Mother and Father arguing and things breaking. Lawrence believed that Lauren was going through something as she would not otherwise have thoughts of hurting herself.

The social worker spoke with Lauren the next day. Lauren denied that Father and Mother had been involved in any recent incidents of domestic violence, and denied that she had any recent suicidal ideation. Lauren indicated that Father was living in the home with Mother but said everything was fine.

## B.    DCFS Obtains a Protective Custody Warrant for A.F.

After these January 2022 discussions with Lawrence and Lauren, DCFS applied under section 340, subdivision (b) for a protective custody warrant removing A.F. from Father's custody. DCFS alleged that "there [was] probable cause to believe there [was] a substantial danger to the safety or to the physical or

_____

[5] In her report, the social worker indicated that she "asked about the incident [*sic*] on 5/10/20 and 5/10/21." Father responded regarding one incident which, given the context, appears to be the May 10, 2020 incident.

emotional health of [A.F.]." In support, DCFS submitted a declaration from the social worker who had conducted the investigation described above setting forth the facts gathered during that investigation. The social worker averred that she was "seeking removal of [A.F.] from [F]ather's custody due to his engaging in domestic violence with [Mother] which negatively impacts the minor." The social worker also included a criminal history report for Father showing incidents of domestic violence on four dates—March 26, 2004, October 6, 2012, February 14, 2013, and May 10, 2020—among several other incidents. The social worker averred that a police call log obtained by DCFS "indicated the following: [¶] [On May 10, 2020,] Mother contacted the police due to [F]ather assaulting her in the bedroom. [¶] [On January 23, 2021,] Mother contacted the police due [*sic*] domestic argument with [F]ather."[6] The social worker also provided information from the police report regarding the August 2021 incident, including that Mother told the officers she was afraid of Father, that she had not disclosed to the hospital staff what had actually happened because of her fear, that she had previously reported an incident of domestic violence

---

[6] The description in the police call log of Mother's 911 call on May 10, 2020 can be interpreted to state that the alleged assault took place "in the bedroom." However, DCFS later obtained a police report regarding the incident which disclosed that the alleged assault occurred in the driveway of paternal grandmother's house, while Mother was sitting in a car; the statement "in the bedroom" likely refers to where Father was at the time Mother made the 911 call.

As is noted above, the call log regarding Mother's 911 call on January 23, 2021 makes no apparent reference to Father.

involving Father, and that there were four other incidents of domestic violence involving Father which she had not reported.

On January 13, 2022, the court issued a protective custody warrant removing A.F. from Father's custody. The court found probable cause to believe there was a substantial danger to A.F.'s safety or physical or emotional health, and that continuance in the home of Father was contrary to A.F.'s welfare. The court also found that there were no reasonable means to protect A.F. without temporary removal from Father's physical custody and that DCFS made reasonable efforts to prevent removal.

On January 13, 2022, the social worker contacted both Mother and Father to notify them of the removal order. The social worker informed both Mother and Father that, as a result of the order, Father was not allowed to be at the family home or to reside there.

## C.    Petition and Detention

On January 18, 2022, DCFS filed a section 300 petition on behalf of A.F. and Lauren,[7] based on allegations that Mother and Father "have a history of engaging in violent verbal and physical altercations in the children's home" and that "[s]uch violent conduct on the part of . . . [F]ather endangers the children's physical health and safety and places the children at risk of serious physical harm, damage, and danger." DCFS asserted a claim under section 300, subdivision (a) based on the allegations that Father's violence against Mother created risk of "serious

---

[7] The juvenile court's orders regarding Lauren are not at issue in this appeal, and thus we include details regarding the dependency proceedings regarding Lauren only to the extent they are relevant to the proceedings regarding A.F.

9

physical harm" to the children, and a claim under section 300, subdivision (b)(1) for Mother's alleged failure to protect the children from Father's violent conduct.

On January 21, 2022, the juvenile court held a detention hearing at which it found a prima facie case that A.F. was a child described under section 300, subdivisions (a) and (b)(1), and vested DCFS with temporary placement and custody. The court found Father to be the presumed father of A.F. and that it had no reason to know that A.F. was an "Indian child" as defined in the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.). The court ordered A.F. detained from Father and released to Mother's home, with Father to have monitored visits at least three times a week for three hours; Mother was not allowed to be the monitor for Father's visits. The court ordered family maintenance services for A.F., Mother, and Father. Mother and Father denied the allegations of the petition.

## D.    Jurisdiction/Disposition Report

In a jurisdiction/disposition report filed on March 23, 2022, DCFS indicated it had obtained a police report regarding the May 10, 2020 incident between Father and Mother, and attached a copy of it. The report showed LAPD officers responded to the family home in response to a call for assistance from Mother. The officers interviewed Mother and Father separately. Mother reported that, while she and Father were at paternal grandmother's house in Palmdale for a Mother's Day party, they began to argue after she indicated she wanted to go to a Mother's Day party at Lawrence's family's house, which was also in Palmdale. The argument took place while Mother was sitting in a car in the driveway of paternal grandmother's house, and suddenly Father swung his hand at Mother's face. Mother pulled

her head back but Father's hand struck her mouth. Mother called the police after they arrived back at the family home. Father agreed that he and Mother had argued because she wanted to go to Lawrence's family's Mother's Day gathering, but denied striking Mother and indicated that there had been no physical altercation between them.

According to the police report, officers observed "approximately two small lacerations to [Mother's] bottom inner lip along with redness and swelling." Father claimed the injury was self-inflicted and Mother probably bit her own lip to have him arrested. Father also stated that Mother had dentures and suffered from gingivitis, which would explain the redness and swelling on her gums. Mother told the officers that, on a prior occasion, Father had grabbed her arm but she pulled away and was able to get out of his grip; she did not report this incident. The officers arrested Father.

The jurisdiction/disposition report also summarized various interviews a dependency investigator had conducted on March 16 and 18, 2022. Lawrence stated that Mother had stopped allowing him to visit with Lauren since the dependency proceedings had been initiated, and he had not seen Lauren in two months. According to Lawrence, Lauren stated that she had witnessed the August 2021 incident involving the vase and that the incident took place as alleged in DCFS's petition. In addition, Lawrence stated that Lauren had sent him videos which had sounds of Mother and Father fighting. Lawrence indicated he had lost the recordings, and Lauren refused to send them to him again, stating she did not want A.F. to be taken away. Lawrence stated that Lauren's mood would sometimes be low, and she would ask him to "come get her" so that she could "take a vacation from

11

home, from the madness." Lawrence also alleged that Mother had allowed Father to have unlimited access to the children and that Father took a trip with Mother and the children to Las Vegas.

Lauren again denied that she had ever seen Mother and Father get into any physical altercation. Lauren denied that Mother had allowed Father to see the children outside of monitored visits. She stated that she had gone with Mother and A.F. to Las Vegas, but that Father had not accompanied them.

Father denied any history of domestic violence between himself and Mother and stated that any incidents were "just verbal arguments." Father reiterated that during the August 2021 incident, he had been "talking with his hands" and accidentally hit the vase; contrary to his prior explanation that Mother cut herself cleaning up the shards after the vase shattered, Father now stated that the vase cut Mother when she had tried to catch or block it. Father suggested that Mother may have made false allegations of abuse against him because she was upset with him due to his infidelity.

Mother stated in regard to the August 2021 incident that she and Father were arguing because A.F. had made a mess with ranch dressing; she explained that she had her head turned and did not see exactly how the vase came to fly at her, but she denied that Father swung at her during the incident.[8] Mother

---

[8] DCFS noted in the jurisdiction/disposition report that, when initially interviewed in December 2021, Mother had described the August 2021 incident differently, in that she had stated she and Father were arguing because she was going to finalize the divorce and Father swung his arm and knocked the vase towards her.

denied any prior domestic violence between herself and Father, and stated that any prior incident was "[j]ust arguing." Mother indicated that she called police in January 2021 because someone was parked in front of the gate at her home. Mother denied that she told police officers on May 10, 2020 that Father had hit her in the face.

DCFS concluded in the jurisdiction/disposition report, "The children's safety in the home cannot be ensured at this time without DCFS and [c]ourt oversight. There is an extensive history of [F]ather physically abusing [M]other in the presence of the children and of [M]other failing to protect the children from exposure to this abuse." DCFS recommended that the court sustain the allegations of the section 300 petition, declare the children dependents of the court, issue a stay away order barring Father from having contact with A.F., Lauren and Mother outside of court-ordered monitored visits, and issue an order under section 361, subdivision (c)(1) removing A.F. from Father's custody.

In support of its recommendations, DCFS asserted that there were four documented domestic abuse incidents, but it mistakenly counted the Mother's Day incident twice (once characterizing it as an assault in Mother's bedroom) and included Mother's call to police on January 23, 2021, despite the fact that call had no apparent connection to Father. DCFS also asserted that "[M]other maintained a relationship with . . . [F]ather and allowed him to have unlimited access to the children, putting them at risk of further exposure to domestic violence."

## E. Adjudication

Before the adjudication hearing took place, the court instructed DCFS to consider potential supervision of A.F. under

sections 301 or 360, subdivision (b).  As relevant here, section 301 allows DCFS "subsequent to dismissal of a [section 300] petition already filed, and with consent of the child's parent or guardian, [to] undertake a program of supervision of the child." (*Id.*, subd. (a).)  Section 360, subdivision (b), provides that a court may dispose of a dependency proceeding without adjudicating the child a dependent child of the court by "order[ing] that services be provided to keep the family together and place the child and the child's parent or guardian under the supervision of the social worker." (*Ibid.*)

On May 2, 2022, DCFS filed a last minute information in which it recommended against utilizing sections 301 or 360, subdivision (b) because "Mother and . . . [F]ather continue to deny any domestic violence in the home" despite evidence to the contrary, and "[M]other and . . . [F]ather are already in violation of [c]ourt orders, including the order that . . . states that [F]ather is not to have any unmonitored contact with the children."

At the adjudication hearing on May 10, 2022, Mother's counsel clarified Mother's position about the August 2021 incident, saying Mother "does not deny that . . . [F]ather threw the vase."  Father's counsel requested the court dismiss the petition, arguing that while Father and Mother had a history of arguments they were not "physical."  Counsel also argued that, according to the police report, Mother was not sure whether Father had thrown the vase or knocked it accidentally, and she did not state to any of the social workers that Father had thrown the vase.  Father's counsel argued that Lauren had not told social workers that she witnessed the August 2021 incident, and Lawrence's claim that Lauren had told him she did witness it was not credible, in part because Lawrence was biased.  Father's

14

counsel requested that if the court did not dismiss the petition, it consider ordering DCFS to provide services and supervise A.F., Mother, and Father under section 360, subdivision (b), without adjudicating A.F. a dependent child of the court.

Counsel for the children requested the court dismiss the allegation under section 300, subdivision (a), but sustain the allegation under section 300, subdivision (b)(1), because both Father and Mother "minimize[d] and downplay[ed] any violence that occurred in the home."

The juvenile court sustained the counts in the petition against Father and Mother as pled. The court found that A.F. was a child described in section 300, subdivisions (a) and (b), declared her a dependent of the court, and placed her in Mother's home under DCFS supervision. The court found by clear and convincing evidence that it was reasonable and necessary to remove A.F. from Father's custody, and it would be detrimental to A.F. if she were to be returned to Father. The court also found that DCFS had made reasonable efforts to prevent removal. The court ordered monitored visitation for Father, to take place at least three times a week in a neutral setting.

As to Mother, the court found there were reasonable services available to prevent removal, and the release of A.F. to Mother would not be detrimental to A.F.'s safety, protection, or physical or emotional well-being.

The court articulated the basis for its jurisdiction and disposition rulings, stating, "The court finds Lauren's statements to her father to be extremely credible and not double hearsay. She looks at her father as a child would as the protector of her. She has no reason to hold back as she might may [sic] have a reason to hold back with the social worker. The court notes and

15

has reviewed the reports and noted her statements she gave to the social worker compared to the one she gave to her father. To the social worker she realizes that there are ramifications. She was very brief in her descriptions. She went as far as to say she didn't witness the [domestic violence], but she was in her room and she heard it. [H]owever, with her father, [Lawrence], who she goes to as a protector, she gave a very detailed statement to him stating that . . . [Father] and . . . [M]other, they argue quite often. She has videos of them arguing. This is consistent with today's times and people, especially, adolescents videotaping everything as evidence. She comes to his house in a down mood and asks to escape the madness. That shows this is not an isolated incident. That shows this is domestic violence between . . . [F]ather and . . . [M]other, as [counsel for the children] has argued is ongoing and the issues have been unresolved for the child to characterize her house as the madness—to escape the madness. She articulated to her father the madness. Mother's statements are very telling with respect to showing that she states she is afraid of . . . [F]ather, that he would kill her. Albeit, he took her—in the most recent incident, he took her to the hospital for 19 stitches, but she did get an emergency protective order. . . . [F]ather has a history of domestic violence arrests. Clearly, this shows his propensity for violence. Mother has indicated that he has hit her in the past. Mother's Day . . . [M]other admitted to the police that . . . [F]ather punched her in her face. She made that statement when there was no time to reflect of [*sic*] the consequences of making that statement. The court finds that statement to be more credible than [M]other's subsequent statements of downplaying. With respect to the vase, the court does not find the explanations of [M]other nor [F]ather

16

to be credible that in an animated manner he hit the vase, it shattered and caused 19 stitches. It was very purposeful based on the statements that he threw the vase at . . . [M]other with the intent of injuring . . . [M]other, in which he did. She had to receive 19 stitches. [M]other, yes, proceeded to call the police because . . . [F]ather is violent, but [M]other has done so in the past. But the evidence is clear that . . . [M]other then takes . . . [F]ather back. And according to the child Lauren, the madness starts over and over. So it's very clear with the call logs, the police have come to this house on several occasions for domestic violence. Mother is mitigating . . . [F]ather's violence towards her. . . . [T]he danger that she's placed her children in by continuing to take him back, by violating the [c]ourt's orders. It's very clear the children are not to be in his care. He is to have no access to the children. She has allowed . . . [F]ather back into the house and allowed him to have access to both Lauren and [A.F.]. It clearly shows she lacks the protective capacity." The court also stated it "believes Lauren's statements to her father that she was present when that incident occurred with respect to the vase. And she could very well have been hurt—injured like her mother."

On July 11, 2022, Father filed a timely appeal of the juvenile court's May 10, 2022 order.

## DISCUSSION

### A. Standard of Review

We review a juvenile court's jurisdictional and dispositional findings for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) Under this standard, " 'we determine if substantial evidence, contradicted or uncontradicted, supports [the findings]. "In making this determination, we draw all reasonable inferences

17

from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*Ibid*.) We will affirm a judgment if it is supported by substantial evidence "even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence." (*In re Dakota H*. (2005) 132 Cal.App.4th 212, 228.) "However, '[s]ubstantial evidence is not synonymous with any evidence. [Citation.] To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value.' [Citations.]" (*In re Cole L*. (2021) 70 Cal.App.5th 591, 602.)

Given that the dispositional finding must be supported by clear and convincing evidence, "when there is a substantial evidence challenge, the reviewing court must determine whether the record contains substantial evidence from which a reasonable trier of fact could find the existence of that fact to be highly probable." (*In re V.L.* (2020) 54 Cal.App.5th 147, 149; see *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996 ["when reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true"].)

18

**B.    Substantial Evidence Supports the Juvenile Court's Assertion of Jurisdiction**

Father contends that there is insufficient evidence to support the juvenile court's jurisdiction findings.  As explained below, we conclude the juvenile court's jurisdictional finding under section 300, subdivision (a) is not supported by substantial evidence because there is no evidence that A.F. is at substantial risk that Father will injure her nonaccidentally.  However, substantial evidence does support the court's finding of jurisdiction under subdivision (b)(1)(A) of section 300 based on Mother's failure to protect A.F. from incidents of domestic violence between herself and Father.  As a result, we affirm the juvenile court's assertion of jurisdiction because "a jurisdictional finding good against one parent is good against both.  More accurately, the minor is a dependent if the actions of either parent bring [the minor] within one of the statutory definitions of a dependent.  [Citations.]"  (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397; accord, *In re D.P.* (2013) 14 Cal.5th 266, 283 ["[T]he principle that '[d]ependency jurisdiction attaches to a child, not to his or her parent' [citation], means that ' "[a]s long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate" ' "].)

1.    *The Applicable Law*

At the jurisdictional stage, the juvenile court must determine by a preponderance of the evidence if a child is described by section 300.  (§ 355, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248.)  The juvenile court here asserted jurisdiction under section 300, subdivisions (a) and

19

(b)(1)(A).[9]  Subdivision (a) authorizes juvenile court jurisdiction in situations where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian."  (*Id.*, subd. (a).)  " 'Nonaccidental' generally means a parent or guardian 'acted intentionally or willfully.' "  (*In re Cole L.*, *supra*, 70 Cal.App.5th at p. 601, quoting *In re R.T.* (2017) 3 Cal.5th 622, 629.)  The statute provides that "a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm."  (§ 300, subd. (a).)

Subdivision (b)(1)(A) of section 300 authorizes dependency jurisdiction where the child has suffered, or there is a substantial risk that the child will suffer, serious physical harm as a result of the failure of their parent to adequately supervise or protect the child.

"Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child.  [Citations.]  The court may consider past events in deciding whether a child presently needs the court's

_____

[9] Section 300 was amended effective January 1, 2023. (Stats. 2022, ch. 832, § 1.)  The amendments are immaterial to the issues presented in this case, and we will refer to the current version of the statute.  Current subdivision (b)(1)(A) was formerly set forth in subdivision (b)(1).

20

protection. [Citations.] A parent's ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' [Citations.]" (*In re Cole L.*, *supra*, 70 Cal.App.5th at pp. 601-602.)

2. *Substantial Evidence Does Not Support the Jurisdictional Finding under Section 300, Subdivision (a)*

Section 300, subdivision (a) concerns injury inflicted on a child "nonaccidentally." Here, there is no evidence of any injury, nonaccidental or otherwise, inflicted on A.F. Nor is there substantial evidence, based on Father's past conduct, that there is a substantial risk he will injure her nonaccidentally in the future. Our colleagues in Division Seven recently concluded that a juvenile court's jurisdictional finding under subdivision (a) of section 300 based on past incidents of domestic violence was not supported by substantial evidence where "there was no evidence any violence took place in the presence of [the children], let alone under circumstances that could support a finding of a substantial risk that either child would suffer serious physical harm inflicted nonaccidentally." (*In re Cole L.*, *supra*, 70 Cal.App.5th at p. 604.) Here, there is no evidence A.F. witnessed the August 26, 2021 incident, and there is no evidence that the circumstances of that incident (or any other incident) posed a risk that A.F. would be injured nonaccidentally. Thus, the evidence of past domestic violence perpetrated by Father against Mother cannot support the juvenile court's jurisdictional finding under section 300, subdivision (a).

21

### 3. *Substantial Evidence Supports the Jurisdictional Finding under Section 300, Subdivision (b)(1)(A)*

Substantial evidence does support the juvenile court's finding that A.F. was a child described in subdivision (b)(1)(A) of section 300. A current risk of harm can be shown by evidence of past conduct where there is a reason to believe the conduct will recur. (*In re Cole L.*, *supra*, 70 Cal.App.5th at p. 602; *In re S.O.* (2002) 103 Cal.App.4th 453, 461.) That is the situation here, as Father and Mother have a history of domestic violence which was likely to recur, absent juvenile court intervention, thereby exposing A.F. to a substantial risk of accidental physical injury. (*In re T.V.* (2013) 217 Cal.App.4th 126, 135 [substantial evidence supported the juvenile court's jurisdictional finding under former § 300, subd. (b)(1) where past violence between the parents "was likely to continue, further exposing [the child] to the risk of serious physical harm"]; *In re Heather A.* (1996) 52 Cal.App.4th 183, 194 [substantial evidence supported the juvenile court's jurisdictional finding under former § 300, subd. (b)(1) based on the parents' pattern of domestic violence because "domestic violence in the same household where children are living . . . is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it"].)

First, the evidence showed a history of domestic violence perpetrated by Father against Mother. Father points to his statements denying any such domestic violence, as well as to those times that Mother denied or minimized the incidents, to argue against the juvenile court's finding. He also asserts the juvenile court should not have credited Lawrence's statements because of his purported bias. But in reviewing for substantial

22

evidence, we " ' " 'ordinarily *look[ ] only at the evidence supporting the successful party, and disregard[ ] the contrary showing.*' " ' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527, disapproved on another ground in *Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1010, fn. 7.) As the juvenile court noted, ample evidence (including Mother's contemporaneous and more unguarded statements) supports the conclusion Father perpetrated multiple incidents of domestic violence against Mother. Lawrence's credibility was an issue for the juvenile court, and we must defer to the court's finding that his statements were credible. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)

Second, there was substantial evidence that domestic violence between Father and Mother would continue absent juvenile court intervention. Mother sought police assistance after being physically abused by Father on May 10, 2020 and on August 26, 2021, and obtained an emergency protective order after the August 26, 2021 incident, but on both occasions she eventually took Father back into the family home. Although Mother had filed for divorce, no evidence showed she had followed through; when Father was interviewed in March 2022, he indicated that he and Mother were still in a relationship and were working on their marriage. Finally, there was evidence that Mother was allowing Father access to A.F. in violation of court orders restricting his visitation.

Furthermore, both Father and Mother consistently failed to acknowledge the severity of the physical altercations between them, repeatedly denying any history of domestic violence and characterizing incidents as "just arguments." This creates a significant risk that Mother and Father will not feel compelled to make the changes necessary to avoid future altercations. "A

parent's denial of domestic violence increases the risk of it recurring. [Citations.]" (*In re V.L.*, *supra*, 54 Cal.App.5th at p. 156.)

Father argues that there is no substantial evidence that A.F. witnessed the August 26, 2021 incident or any other incident of domestic violence. A.F.'s lack of presence during a past incident of domestic violence does not negate the possibility that, in the future, A.F. might be present, which would subject her to a risk of physical harm. (See *In re Heather A.*, *supra*, 52 Cal.App.4th at p. 194, fn. omitted ["Obviously the children were put in a position of physical danger from this violence [perpetrated by the father against the mother], since, for example, they could wander into the room where it was occurring and be accidentally hit by a thrown object, by a fist, arm, foot or leg, or by [the mother] falling against them"].) Nothing in the record suggests that the past incidents of domestic violence took place where the children could not be present; on the contrary, the August 26, 2021 incident occurred in the family home, and the May 10, 2020 incident occurred at a family gathering for Mother's Day.

Father argues that this case is factually similar to *In re Daisy H.* (2011) 192 Cal.App.4th 713, disapproved on another ground in *In re D.P.* (2023) 14 Cal.5th 266, 278, and *In re M.W.* (2015) 238 Cal.App.4th 1444, where the courts found substantial evidence did not support jurisdictional findings under former section 300, subdivision (b)(1) based on allegations of domestic violence. Both cases are distinguishable because the juvenile courts in those cases asserted jurisdiction based on isolated incidents of domestic violence that had occurred years before the dependency case was initiated, and there was no evidence the

24

parents had ongoing relationships. (See *In re M.W.*, *supra*, 238 Cal.App.4th at p. 1454; *In re Daisy H.*, *supra*, 192 Cal.App.4th at p. 717.) The domestic violence perpetrated by Father in this case is more recent, more substantial in terms of the number of incidents, and as discussed above there is evidence that Mother and Father were still involved with one another. Thus, *In re Daisy H.* and *In re M.W.* are inapposite.

In conclusion, there was substantial evidence that Father and Mother had a history of domestic violence, and that it would continue absent intervention by the juvenile court. Under these circumstances, the juvenile court could properly find a substantial risk that A.F. would accidentally suffer serious physical harm as the result of future domestic violence by Father against Mother.

## C. The Juvenile Court's Removal Order Was Supported by Substantial Evidence and Father Forfeited His Argument that the Court Should Have Considered Granting Him Custody in Paternal Grandmother's Home

Father challenges the juvenile court's order removing A.F. from his custody. We conclude that substantial evidence supports the removal order and that Father has forfeited the alternative challenge he raises to the removal order.[10]

---

[10] We also reject Father's contention that the court did not apply the proper standard—clear and convincing evidence—in making its removal order. The court's minute order states that its findings regarding the removal order were based on clear and convincing evidence. Father cites to the transcript of the jurisdiction/disposition hearing, but nothing in the court's

1. *The Applicable Law*

To remove a child from parental custody, the juvenile court must find by clear and convincing evidence that specified circumstances are present justifying such a disposition. (§ 361, subds. (c)(1) & (d).) The circumstances that can justify removal depend on whether the child was living with the parent at the time the dependency case was initiated. Subdivision (c) of section 361 applies when the child was living with the parent at that time, and it lists five circumstances that justify removal (*id.*, subd. (c)(1)-(5)); subdivision (c)(1) sets forth the only circumstance that potentially applies here: "There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."

Subdivision (d) of section 361 applies when the child was *not* living with the parent at the time the dependency proceeding was filed, and it provides only one circumstance that justifies removal. Specifically, as applicable here, subdivision (d) of section 361 applies when the juvenile court finds "there would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child for the parent . . . to live with the child or otherwise exercise the parent's . . . right to physical custody, and there are no reasonable means by which the child's physical and emotional health can be protected

---

statements on the record shows that it applied an incorrect standard of proof.

26

without removing the child from the child's parent's . . . physical custody."

The court's removal order references both subdivisions (c) and (d) of section 361. The court did not make a factual finding about whether A.F. was residing with Father, and the evidence on that point was conflicting. However, we need not decide whether our review should focus on subdivision (c)(1) or (d) of section 361 because the two subdivisions set forth essentially equivalent standards in the context of this case, as both are triggered when there "would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child" were the child to live with the parent.[11] (*Id.*, subds. (c)(1) & (d).)

"Actual harm to a child is not necessary before a child can be removed." (*In re V.L.*, *supra*, 54 Cal.App.5th at p. 154.) This is because the focus of the statute is on averting harm to the child. (*In re D.B.* (2018) 26 Cal.App.5th 320, 328; *In re T.V.*, *supra*, 217 Cal.App.4th at pp. 135-136.) In determining whether a child may be safely maintained in the parent's physical custody, "the [juvenile] court may consider the parent's past conduct as well as

_____

[11] Subdivision (c)(1) of section 361 lists two specific alternatives which the juvenile court "shall consider" before removing a child from a parent's custody: "(A) The option of removing an offending parent . . . from the home. [¶] (B) Allowing a nonoffending parent, guardian, or Indian custodian to retain physical custody as long as that parent, guardian, or Indian custodian presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm." (*Id.*, subd. (c)(1)(A) & (B).) Subdivision (d) does not require the court to consider any specific alternatives. (*Id.*, subd. (d).)

present circumstances." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.)

2.  *Substantial Evidence Supports the Juvenile Court's Removal Order*

Father contends, "The record simply lacks substantial evidence for the court's determination why placement of [A.F.] in the home of parents [M]other and [F]ather would pose 'a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home,' and that even with the provision of services, there is no other reasonable way to protect her."

We disagree. Father had a history of perpetrating domestic violence against Mother, which included him throwing a heavy object. In addition, at least two of the domestic violence incidents occurred in family settings, the most recent in the family home and the earlier one at a Mother's Day party. There was also ample evidence that the conduct would recur. Father and Mother were in denial about their history of domestic violence. Mother had reported Father's domestic violence to the police on two occasions (and did not on others), but each time had accepted Father back into the family home. Given these facts, the court could reasonably conclude there was a substantial danger Father's conduct placing A.F. at risk would recur, justifying removal to ensure A.F.'s safety. (*In re V.L.*, *supra*, 54 Cal.App.5th at p. 158.)

Father argues that the August 2021 incident was an "isolated event of the past," and incorporates the arguments he makes in challenging the juvenile court's jurisdictional finding. We reject these arguments for the same reasons we find them meritless in affirming the jurisdictional finding. In short, there is

28

substantial evidence that the August 2021 incident was not isolated but part of a pattern of abuse, and that Father's violence against Mother on that occasion was not accidental.

*In re Henry V.* (2004) 119 Cal.App.4th 522, upon which Father relies, is distinguishable because the only evidence that the child in that case faced an ongoing risk of harm was one prior incident of abuse. (*Id.* at p. 529.) Furthermore, it was apparent that the juvenile court in that case issued its removal order to facilitate the child receiving services, including a bonding study; the appellate court concluded this was error, as the services could have been provided while the child was in his mother's custody. (*Ibid.*) Here, in contrast, the juvenile court issued its removal order based on its concern, supported by substantial evidence of a pattern of behavior, that A.F. faced a substantial risk of harm were she to live conjointly with Father and Mother.

3. *Father Forfeited His Argument He Should Have Been Allowed to Have Custody of A.F. at Paternal Grandmother's House*

Father additionally faults the juvenile court for not considering the alternative of placing A.F. in the shared custody of Father in the home of paternal grandmother along with unannounced DCFS visits. As DCFS points out, Father never suggested this alternative to the juvenile court. Instead, Father asked the court to consider something different: "a home of parent [F]ather and [M]other order as to [A.F.]" and, alternatively, "unmonitored [visits] in a neutral setting." In other words, Father faults the court for not adopting an alternative that was never suggested. "A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court. [Citations.]

29

Forfeiture, also referred to as 'waiver,' applies in juvenile dependency litigation and is intended to prevent a party from standing by silently until the conclusion of the proceedings." (*In re Dakota H.*, *supra*, 132 Cal.App.4th at pp. 221-222.)

Had Father suggested the alternative he now proposes, "the court could have considered [his] claim." (*In re Dakota H.*, *supra*, 132 Cal.App.4th at p. 222.) We cannot evaluate Father's suggestion made for the first time on appeal, because it involves factual issues not developed below. Father never raised with DCFS the possibility that A.F. could stay with him in paternal grandmother's home or anywhere else. The record does not disclose whether Father was residing with paternal grandmother, and, if not, whether paternal grandmother would permit Father to do so. We do not know who else resided in paternal grandmother's home, or if it was otherwise appropriate for A.F. to spend overnights there. Nor do we know if paternal grandmother would consent to unannounced visits to her home by DCFS. Without knowing the answers to these questions, we cannot evaluate whether the proposal Father advances for the first time on appeal was potentially even possible. It is for such reasons that "[a] party may not assert theories on appeal which were not raised in the trial court." (*Id.* at p. 222.)

## DISPOSITION

The juvenile court's jurisdiction and disposition orders are affirmed.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

ROTHSCHILD, P. J.

CHANEY, J.